J. S11013/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DONNA SCOTT, T/A BUCKINGHAM DANCE AND EXERCISE STUDIO | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : | |
| LAURA GIACOMELLI AND LIBRA DANCE STUDIO, LLC, | : : | No. 2090 EDA 2015 |
| Appellants | : : | |

Appeal from the Order Entered June 22, 2015,
in the Court of Common Pleas of Bucks County
Civil Division at No. 2011-07442

BEFORE:  FORD ELLIOTT, P.J.E., OTT AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JULY 27, 2016**

Laura Giacomelli ("Giacomelli") and Libra Dance Studio, LLC ("Libra"), (collectively, "appellants") appeal the order of the Court of Common Pleas of Bucks County that entered judgment in the amount of $96,217 against them and in favor of Donna Scott ("Scott"), trading as Buckingham Dance and Exercise Studio ("Buckingham").

## I.  Background.

Scott owned and operated Buckingham which was located at 2547 Bogarts Tavern Road, Buckingham, Bucks County, Pennsylvania.  Scott and her husband, Herbert Scott, owned the property as tenants by the entireties.  Buckingham provided dance and exercise instruction to members of the general public.

Giacomelli started working at Buckingham in 2007 as an independent contractor. She also worked at other dance studios both before and after she started working at Buckingham. When she started at Buckingham, Giacomelli taught mostly one night per week, at the rate of $35-40 per hour. During her second year at Buckingham, Giacomelli taught one or two days a week. During her third year, which was the 2009-2010 season, Giacomelli taught three days per week at Buckingham and two days per week at another dance studio. Scott was aware that Giacomelli worked at various other dance studios when Giacomelli was also working for her. Scott informed Giacomelli at the end of the 2009-2010 season, which was in June 2010, that she was going to promote Giacomelli to the position of artistic director of Buckingham. In addition, Scott offered Giacomelli a $5 per hour raise effective at the start of the 2010-2011 season.

Just prior to the start of the 2010-2011 season, Scott required all teachers to sign a Service/Not to Compete Agreement (Agreement). Giacomelli initially refused to sign the Agreement but did so because she believed that Scott would terminate the employment arrangement with her if she did not sign it. Giacomelli signed the Agreement on August 29, 2010.

Giacomelli did not teach at other studios during the 2010-2011 season. She taught approximately 16 classes per week in the non-competitive dance portion of Buckingham for 4 to 5 hours per night, 5 days a week.

Giacomelli started a competition team in 2008-2009 in order to challenge the students and to provide an opportunity for older dancers to remain at Buckingham. Scott agreed to allow Giacomelli to establish the team which Giacomelli called the Buckingham Dance Company ("BDC"). During the first year of the BDC, parents made checks payable to either Giacomelli or Brenda Jagelka, who was brought in to assist with tap and jazz choreography for the BDC. Any sums collected for the BDC were collected directly from the parents and were not paid to Buckingham or Scott. In subsequent years, all payments were made to Giacomelli, who kept all of the books, records, and accounts for the BDC. Giacomelli also maintained the roll books and records for the BDC. The BDC participated in two or three competitions per year. The amount a dancer or her parents paid to Giacomelli was dependent on how many routines and styles of dance the dancer performed or learned. Each dancer at the BDC took classes at Buckingham. Each dancer was required to be a part of the ballet program at Buckingham in addition to whatever style the dancer was dancing on the competition team. According to Giacomelli, participation in the BDC resulted in significantly increased enrollments for Buckingham. In June 2011, there were between 200 to 300 students enrolled at Buckingham, while Giacomelli had about forty girls on her dance team.

## II. **Restrictive Covenant.**

The Agreement provided that Giacomelli was to serve as an independent contractor and provide dance instruction, commencing on September 7, 2010, and continuing for a period of nine months and that Giacomelli was to receive pay of $45 per hour for actual instruction services provided. The Agreement further provided the following:

> 7. During the 9 month term of this Agreement, and for a period of one (1) year thereafter this service agreement is signed Instructor shall not:
>
>    a. Solicit any students through any means. . . by email, social networks, mail, telephone, word of mouth, or any other means of communication who are clients of the Studio, or otherwise induce them to discontinue lessons at the studio or to patronize or engage any other dance or exercise studio or instructor;
>
>    b. Within a radius of twenty[-]five (25) miles of the Studio's present physical location, without the written consent of the Studio, engage in the business of the teaching or instructing of any form of dance or exercise, whether as an instructor or as a sole proprietor, partner, shareholder, officer, director, employee, agent or other representative of any entity which engages in such business.

Agreement, 8/29/10 at 2-3 ¶7.

Over a period of more than two years, the Scotts and Giacomelli discussed the possibility of Giacomelli purchasing Buckingham and the real property on which it was located. In April or May 2011, Giacomelli informed the Scotts that she would not be purchasing the business and the real property which the Scotts valued at a total of $935,000.

Shortly after that, Giacomelli informed Scott that she would finish out the 2010-2011 season and then leave Buckingham and would not return. On May 16, 2011, Scott informed the parents of Buckingham students and the parents of the competition team members that Giacomelli would not be returning to teach in the next season.

On August 1, 2011, Giacomelli opened a dance studio under the Libra name at 1507 West Street Road in Warminster, Bucks County, Pennsylvania. The dance studio was located approximately 8 to 10 miles from Buckingham.

### III. Complaint.

On August 18, 2011, Scott commenced an action in the trial court against appellants. Scott alleged:

19. Further, at the time of her departure, Giacomelli retained [Scott's] customer list; and utilizing that list, Giacomelli solicited [Scott's] clients and customers either directly and/or indirectly, including but not limited to posting on her website and on the social media.

20. Of the approximately thirty-eight competition team members who were expected by Ms. Scott to enroll in her July 5, 2011 summer session, only eight actually enrolled as a result of Giacomelli's solicitation, resulting in a loss of

over $10,000 in projected revenues to the studio.

21. The loss of the approximately thirty or more students who were solicited by Giacomelli to leave [Scott's] competition team, as well as the loss of numerous non-competition students from the sixteen other classes which were taught by Giacomelli, will have a significant impact upon [Scott's] Fall enrollment, and thus upon [Scott's] expected revenues. As of the date of this filing, only one member of the competition team, out of 38, has enrolled for the Fall session.

22. Not only will [Scott] lose the students who have already been solicited by Giacomelli, it has been the history of [Scott's] business over the years that once a family has enrolled a child for instruction, that family typically enrolls additional family members along with friends for dance instruction with [Scott]. Thus, by tapping into [Scott's] current list of enrolled students, the defendant Giacomelli will have a significant impact upon the future revenue stream, the good will of [Scott's] business, and the future viability of the business.

Complaint, 8/18/11 at 6-7 ¶¶ 19-22.

In Count I of the Complaint, Scott sought enforcement of the restrictive covenant and asked the trial court to enter an order that required appellants to account for all business and profits obtained in violation of the restrictive covenant and to disclose all of the names and addresses of Scott's former clients who were enrolled or would be enrolling at Libra. Scott also sought an injunction to restrain the appellants from soliciting or contacting past and present customers of Scott, to restrain the appellants from

competing with Scott within the area and time proscribed by the parties' restrictive covenant, and that the trial court order appellants to return all written trade secrets obtained from Scott, including but not limited to, Scott's customer lists, roll books, and price lists.

In Count II of the Complaint, Scott sought damages for breach of contract in excess of $50,000. In Count III of the Complaint, Scott sought the return of all trade secrets wrongfully appropriated by appellants and an award of damages from the loss of trade secrets appropriated by appellants.[1]

### IV. **<u>Non-Jury Trial</u>**.

A non-jury trial commenced in the trial court on February 6, 2014. Scott called Giacomelli to testify on cross-examination. Giacomelli testified that she refused to sign an employment contract with Scott for the 2009-2010 season because she was teaching at another studio within a 25-mile radius of Buckingham. She did not believe that it was appropriate to sign a covenant not to compete because she was working elsewhere. (Notes of testimony, 2/6/14 at 50.) When Scott presented Giacomelli with the Agreement for the 2010-2011 school year, Giacomelli initially refused to sign it, but Scott told her that if she did not sign it, she could not work for her that school year. (***Id.*** at 54.) Giacomelli testified that she started the

---

[1] Originally, there was a Count IV to the Complaint which Scott withdrew on November 9, 2011.

competition team at Buckingham. (*Id.* at 59.) Giacomelli explained that the money from the competition team went to her and not to Scott. (*Id.* at 72.) Giacomelli admitted that when she started her new dance studio, she was aware that its location was less than 25 miles from Buckingham in violation of the covenant not to compete. (*Id.* at 106-107.)

Giacomelli testified on direct examination that the creation of the competition team resulted in more classes and registrations at Buckingham. (Notes of testimony, 2/7/14 at 26.) Giacomelli further testified that Scott notified her in June of 2010 that she would be receiving a raise to $45 per hour in the fall of 2010. At that time, Scott did not request that Giacomelli sign the Agreement. (*Id.* at 43-44.) Giacomelli explained that there were approximately 20 dance studios in an 8-mile radius from Buckingham and 142 in a 25-mile radius from Buckingham. (Notes of testimony, 7/21/14 at 61.)

John E. Mitchell ("Mitchell"), a certified public accountant who was also certified in financial forensics and accredited in business valuation and the managing partner of MDG, LLC, testified on behalf of Scott that Scott lost $124,272 in revenue in the one-year period after Giacomelli left Buckingham. (*Id.* at 25-26.) According to Mitchell, 38 students left Buckingham to go to Libra when Giacomelli started Libra. (*Id.* at 28.) On cross-examination, Mitchell admitted that he did not calculate lost profits. (*Id.* at 79.) Mitchell later revised the loss in revenues by attempting to

calculate the cost of products sold, such as dancewear, and concluded that the economic damages were $106,425. He determined that the sales of items accounted for $35,693 in revenue, with costs of $17,847. (*Id.* at 128.)

Scott testified and described her business, the development of the competition team, and the possibility of Giacomelli's purchase of Buckingham. Scott testified that after Giacomelli left, the competition team dropped from approximately 40 students to approximately a dozen. (*Id.* at 113-114.) On cross-examination, Scott testified that even though she could not produce them, Giacomelli signed restrictive covenant agreements in prior years before 2010. (*Id.* at 153.) Scott admitted that her dance studio had no unique methods of instruction and was like any other dance studio. (*Id.* at 167-168.)

## V. Conclusions of the Trial Court.

The trial court made the following relevant conclusions of law:

9. Here, the covenant not to compete in the Agreement is ancillary to the main purpose of the Agreement, which was for the employment of Ms. Giacomelli as an independent contractor to teach dance, in exchange for compensation to be paid by Ms. Scott of [Buckingham]. . . .

. . . .

14. Ms. Scott of [Buckingham] has protectable, legitimate business interests related to her customer and/or client bases at [Buckingham], along with acquired goodwill.

15.    Ms. Giacomelli was instrumental in the creation of the Competition team, and therefore she understood Ms. Scott's need to limit future competition. . . .

. . . .

18.    Courts seldom criticize restraints of six months or a year on the grounds of duration, and even longer restraints are often enforced. . . . The restraint on Ms. Giacomelli of one (1) year following her departure from [Buckingham] in June of 2011, was well within acceptable practices of restraint in non-competition agreements in this Commonwealth.

. . . .

20.    We cannot on this record declare that, as a matter of law, the subject Non-Compete is unreasonable in regard to the geographic limit. In addition to the reasonable time restriction of only one year following employment at [Buckingham], we find the 25 mile geographic radius restriction reasonable.

21.    Accordingly, in sum, we find the terms of the restrictive covenant not to compete in the parties' subject Agreement to be reasonable in terms of duration as well as with regard to geographical limitations.

22.    Ms. Giacomelli created and opened [Libra] with actual knowledge she was violating the Non-Compete Agreement which she had signed. While Ms. Giacomelli essentially admitted such actual knowledge in her testimony, we found Ms. Giacomelli's testimony which was at variance with this knowledge to lack credibility.

. . . .

24.  There was adequate, valuable consideration for the Non-Compete executed between the parties on August 29, 2010. Ms. Giacomelli received a raise in compensation from $40.00 per hour to $45.00 per hour, which represented a 12.5% pay increase, and her title was changed from Instructor to Artistic Director. Accordingly, her job status at [Buckingham] was beneficially changed.

25.  While the anticipated pay raise and promotion to Artistic Director were discussed verbally in the spring of 2010 by Ms. Scott and Ms. Giacomelli, such beneficial changes did not take place until Ms. Scott and Ms. Giacomelli executed the written Agreement on August 29, 2010. The record supports the conclusion that both parties understood this to be a reasonable arrangement, given that dance school programs are typically based upon a September through June dance year.

26.  Regardless of whether prior written employment agreements were executed, and regardless of whether Ms. Giacomelli was a continuous independent contractor for Ms. Scott and [Buckingham], or whether the Agreement executed on August 29, 2010 was the first Non-Compete Agreement signed by Ms. Giacomelli, there was adequate, valuable consideration supporting the restrictive covenant in the form of change in job status, and/or in the form of an increase in pay from the previous year.

. . . .

27.  Ms. Giacomelli implied in her testimony that she executed the Non-Compete Agreement in August, 2010, under duress, because otherwise she would have lost her job, and it was too late to find a new position elsewhere for the dance year.

28. The record is abundantly clear that Ms. Giacomelli could have obtained alternative employment without unreasonable difficulty, because she was a well-qualified and well-trained dance instructor, and was significantly well-established with a variety of dance programs.

29. Ms. Scott did not place Ms. Giacomelli in a position which eliminated Ms. Giacomelli's free will in August 2010. Accordingly, Ms. Giacomelli's claim of duress is without merit.

. . . .

30. The restriction contained in the Non-Compete provision stated that during the nine-month term of the Agreement, and for a period of one year thereafter, the instructor was prohibited from soliciting [Buckingham] students through any means by email, social networks, mail, telephone, word of mouth, or any other means of communication. However, the record reveals that such communications by Ms. Giacomelli did, in fact, occur during the pertinent time period.

31. The restriction in the Non-Compete also prohibited Ms. Giacomelli from otherwise inducing [Buckingham] students from discontinuing their lessons at the studio, or patronizing or engaging any other dance or exercise studio or instructor. The record reveals however, that during the operative period of the restrictive covenant Ms. Giacomelli, by way of her website for [Libra], newspaper advertisements, newsletters, and e-mail communications with [Buckingham] students' parents, directly and indirectly solicited students to leave [Buckingham] and to enroll at [Libra], her competing dance studio.

32. Ms. Giacomelli did not meet her burden of establishing unreasonableness as to the Non-Compete, nor did she demonstrate why it is unenforceable, given the facts and circumstances of this litigation. . . . Accordingly, the subject Non-Compete Agreement is enforceable, subjecting Ms. Giacomelli to liability for damages caused by her breaches.

. . . .

34. Mr. Mitchell's testimony as to the accounting analysis he performed to calculate the measure of damages incurred by [Buckingham] caused by Ms. Giacomelli's breaches of contract, while largely uncontroverted, was flawed in some respects. Such flaws were predominantly due to his evaluation which relied upon data provided solely by Ms. Scott, without further verification. The area of greatest erroneous evaluation appeared to be Mr. Mitchell's reliance on expense figures provided by Ms. Scott.

35. Mr. Mitchell's opinion testimony was that pertinent economic damages suffered by Ms. Scott were [$106,425] as a result of Ms. Giacomelli's breaches in the year following her departure from [Buckingham].

36. Ms. Giacomelli provided essentially unrefuted testimony, including testimony as to [Buckingham] expenses, which afforded guidance to this Court by which we herein modify lost profit calculations as opined by Mr. Mitchell.

37. Based on the record in its entirety we find that Ms. Scott did suffer causally related economic damages in the year following the departure of Ms. Giacomelli from [Buckingham] as a result of Ms. Giacomelli's breaches, but we modify

Mr. Mitchell's calculations as indicated in the following Verdict and Order.

Trial court opinion, 4/21/15 at 44-50, Conclusions of Law Nos. 9, 14-16, 20-22, 24-32, and 34-37.

The trial court awarded Scott $96,217.00 as compensatory damages.

## VI. **Post-trial Motion.**

Giacomelli moved for post-trial relief and argued that the trial court committed an error of law when it found that the restrictive covenant was valid and enforceable when there was not adequate consideration, the restrictive covenant was not reasonably limited in geographic scope, Giacomelli signed the restrictive covenant under duress, the restrictive covenant was unacceptable due to its timing, and Scott failed to prove damages.

By order dated June 18, 2015, the trial court denied the post-trial motion.

## VII. **Issues before this Court.**

Appellants raise the following issues for this court's review:

(a) In order to be enforceable, Pennsylvania law requires that a restrictive covenant be ancillary to the acceptance of employment, supported by adequate consideration, and reasonably limited in geographic scope. Should a restrictive covenant that fails to meet these requirements be unenforceable?

(b) Pennsylvania courts have held that a contract made under duress may be avoided. Was a contract made under duress and therefore

- 14 -

avoidable where it was unsuspectingly presented to an employee, who had given up her other employment and where she was not given an opportunity to have the contract reviewed by an attorney and had to sign it on the spot?

(c) If a contract is clear and unambiguous, are the parties bound to the plain language of the contract?

(d) Pa.R.C.P. 4003.5(c) prohibits an expert at trial from testifying beyond, or inconsistent with, his report. Should an expert be prohibited from testifying as to lost profits after hearing the testimony of another party, where his reports focus on lost revenues and where he admitted that he did not calculate lost profits?

(e) Pennsylvania law states that damages must be established by sufficient evidence and testimony. Where the plaintiff's damages on [sic] calculated on speculative, unverified figures, and where no supporting documentation has been provided, has the plaintiff failed to prove damages?

(f) If the plaintiff has failed to establish a case again[st] a defendant, should the judgment entered against the defendant be vacated?

Appellants' brief at 3-4.

This court's standard of review is limited to a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in application of the law. This court considers the evidence in the light most favorable to the verdict winner and will only reverse if the trial court's findings are unsupported by substantial evidence or the findings are based on an error of law. Where a question of

law is at issue, this court's scope of review is plenary. The trial court's conclusions of law in a non-jury trial are not binding on this court because it is this court's duty to determine if the trial court correctly applied the law to the facts of the case. ***Stephen v. Waldron Elec. Heating & Cooling LLC***, 100 A.3d 660, 664-665 (Pa.Super. 2014).

> Restrictive covenants, of which non-disclosure and non-competition covenants are the most frequently utilized, are commonly relied upon by employers to shield their protectible business interests. The non-disclosure covenant limits the dissemination of proprietary information by a former employee, while the non-competition covenant precludes the former employee from competing with his prior employer for a specified period of time and within a precise geographic area. In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent. ***Sidco Paper Co. v. Aaron***, 465 Pa. 586, 351 A.2d 250 (1976); ***Morgan's Home Equip. Corp. v. Martucci***, 390 Pa. 618, 136 A.2d 838 (1957). "Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer." ***Sidco***, 351 A.2d at 254. However, restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living. ***See Jacobson & Co. v. Int'l Env't Corp.***, 427 A.2d 439, 235 A.2d 612 (1967).

***Hess v. Gebhard & Co.***, 808 A.2d 912, 917 (Pa. 2002).

## A. **Lack of Consideration.**

Initially, appellants contend that the restrictive covenant was unenforceable and must be stricken because the covenant was not supported by adequate consideration.

Generally, in order to be enforceable under Pennsylvania law, a restrictive covenant must be ancillary or incidental to the acceptance of employment, must be supported by adequate consideration, and must be reasonably limited in terms of temporal and geographic scope. ***Thermo-Guard, Inc. v. Cochran***, 596 A.2d 188 (Pa.Super. 1991).

For support of their contention that Scott failed to support the Agreement with adequate consideration, appellants point to ***George W. Kistler, Inc. v. O'Brien***, 347 A.2d 311 (Pa. 1975). In ***Kistler***, William J. O'Brien ("O'Brien") was contacted by representatives of George W. Kistler, Inc. ("Kistler") in approximately May 1969 concerning his possible employment with Kistler. Although the possibility of employment was discussed, no decision was made at that time. In the late winter or early spring of 1970, Kistler again contacted O'Brien to discuss employment possibilities. After a discussion of wages, duties, benefits, and other terms of employment, the parties agreed that O'Brien would leave his current position and work for Kistler. The parties did not discuss a restrictive covenant. O'Brien began working for Kistler on May 11, 1970. On approximately his first day of work, O'Brien was asked to sign an

employment contract which stated that in return for Kistler providing employment and the sum of $1.00, O'Brien would not compete with Kistler within 50 miles of Allentown for two years after he left employment with Kistler. *Id.* at 313-314.

Kistler discharged O'Brien on November 16, 1973. O'Brien went into business for himself selling fire extinguishers. This activity competed with Kistler to some extent. Kistler commenced an action in equity in the Court of Common Pleas of Lehigh County ("Chancellor") which enjoined O'Brien from engaging in selling or servicing fire equipment within a 50-mile radius of Allentown. The Chancellor determined that there was no oral contract between the parties, that the written contract was the sole agreement between the parties, and that the employment itself was consideration for the restrictive covenant. O'Brien appealed to the Pennsylvania Supreme Court. *Id.* After reviewing the record, the Pennsylvania Supreme Court determined that a final and binding oral contract of employment existed prior to the signing of the employment agreement because all aspects of the employment agreement were agreed upon orally such that there was no consideration to support the restrictive covenant. *Id.* at 314-316.

Appellants assert that the facts in *Kistler* are analogous to the facts here. Appellants argue that Giacomelli and Scott agreed in April of 2010 that Giacomelli would receive an increase in pay at the start of the 2010-2011 dance year and would have the title of "Artistic Director." She

testified that pamphlets and brochures advertising the 2010-2011 season listed her as artistic director. (Notes of testimony, 7/22/14 at 38.) Appellants argue that Scott never told Giacomelli at that time that she would have to sign the Agreement and that she did not learn about the Agreement until just days before the start of the season when she had given up other employment. As a result, appellants assert that the restrictive covenant was not ancillary to employment and that, as in *Kistler*, Giacomelli and Scott made a verbal agreement concerning her continued employment at Buckingham including her wages and title without mention of the Agreement. Consequently, appellants believe that Giacomelli did not receive adequate consideration for signing the Agreement.

Though *Kistler* is analogous in some respects, it is different in others. For instance, the Pennsylvania Supreme Court in *Kistler* determined that the oral agreement was a complete and binding contract that covered all aspects of the employment relationship between O'Brien and Kistler. Here, while Scott did tell Giacomelli that her rate of pay would increase and that she would have the title of artistic director, there was no discussion, or at least none that can be gleaned from the record, concerning either the duration of her employment or whether in her capacity as artistic director Giacomelli would be an employee or an independent contractor. These terms were not finalized until the parties executed the Agreement. Further, in *Kistler*, there was no evidence that the parties understood that O'Brien

would not become an employee until he signed the restrictive covenant. Here, Giacomelli was aware that Scott or Buckingham required other dance instructors to sign similar agreements. Furthermore, Scott had in at least one previous year asked Giacomelli to sign such an agreement. Giacomelli had declined because she worked at other studios. When she was asked to sign the Agreement, Giacomelli no longer worked at other studios and would be working solely for Scott. The court must determine whether the parties intended to form a binding contract in the spring of 2010. This Court agrees with the trial court that the Agreement was ancillary to Giacomelli's employment.

### B. Business Interests and Geographic Area.

Next, appellants contend that the restrictive covenant was not reasonably limited in geographic scope and was not narrowly tailored to protect a legitimate business interest.

In weighing the interests of the employer and the employee in terms of a restrictive covenant, a court must determine whether the covenant was reasonably necessary for the protection of the employer and whether the temporal and geographical restrictions imposed on the employee are reasonably limited. *Wellspan Health v. Bayliss*, 869 A.2d 990, 999 (Pa.Super. 2005).

The trial court found that Scott had protectable, legitimate business interests with respect to her customer and client base at Buckingham and

with her acquired goodwill. Giacomelli argues that because Scott admitted that she did not have a specialized form of dance instruction and did not provide training to Giacomelli, there is not a legitimate business interest to protect through a restrictive covenant. Giacomelli really does not address the trial court's findings as to the protectable business interest. Clearly, Scott's customer base was a legitimate business interest.

As to the geographic area, appellants argue that a 25-mile radius is overly broad and would cause undue hardship to Giacomelli's right to earn a living as a dance instructor. The trial court concluded that it could not, as a matter of law, find that the Agreement was unreasonable as to the geographic limit. Appellants do not really explain why the 25-mile radius is too broad other than that there were approximately 142 dance studios within a 25-mile radius of Buckingham. The number of dance studios, though, does not really seem to have an effect on the alleged impact of Giacomelli operating a competing dance studio because the impact on Scott is that Giacomelli took her students or customer base and not that there is an additional studio in the area. This court finds no error on the part of the trial court.

## C. **Duress**.

Appellants next contend that the restrictive covenant was signed under duress.

In ***Litten v. Jonathan Logan, Inc.***, 286 A.2d 913 (Pa.Super. 1971), this court explained the theory of economic duress:

> The important elements in the applicability of the doctrine of economic duress or business compulsion are that (1) there exists such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which results in economic loss, and (2) the injured party does not have an ***immediate*** legal remedy.

***Id.*** at 917 (emphasis in original).

The party seeking to avoid a contractual obligation on the basis of duress bears the burden of proof. ***Beato v. DiPilato***, 106 A.2d 641 (Pa.Super. 1954).

Appellants argue that because Giacomelli had given up all of her classes at other dance studios prior to the 2010-2011 season and by late August all of the studios would have had all of their dance teachers in place, she had no alternative but to sign the Agreement as other opportunities were not available.

The trial court determined that it was clear that Giacomelli could have obtained alternative employment without unreasonable difficulty because she was a well-qualified, well-established, and well-trained dance instructor. The trial court further determined that Scott did not place Giacomelli in a position which eliminated Giacomelli's free will.

This court agrees with the trial court. Giacomelli did not attempt to obtain employment elsewhere. Nothing in the record establishes that Scott placed Giacomelli in a position to act involuntarily to sign the contract.

Further, if a party ratifies the contract, that party loses the power to avoid a contract because of duress. ***National Auto Brokers Corp. v. Aleeda Development Corp.***, 364 A.2d 470, 476 (Pa.Super. 1976). "Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." ***Id.*** Here, Giacomelli received payment under the terms of the Agreement for her teaching duties for the duration of the 2010-2011 dance/school year. It was only after Scott sought to enforce the terms of the Agreement that Giacomelli claimed duress. The trial court did not err when it determined that the theory of duress did not apply.

### D. Competition Team.

Appellants next contend that the restrictive contract is inapplicable because it does not apply to the competition team as the Agreement only mentions Buckingham.

Although the trial court did not address this issue in its original opinion, it did in the opinion issued in response to Giacomelli's statement of matters complained of on appeal. The trial court reasoned:

> At trial, Ms. Giacomelli testified that she believed she
> was signing the Non-Compete as to [Buckingham],

- 23 -

but not signing as to the Competition Team. . . . We did not find this testimony credible. While within the language of the Agreement[,] the parties were referred to as "BDS" and "Ms. Giacomelli", the record supports the conclusion that the Competition Team was a facet of [Buckingham]. The record is clear that Ms. Giacomelli established the Competition Team and was solely responsible for management and control as its director. . . . However, the record is also clear that the Competition team was established under the imprimatur of Ms. Scott and [Buckingham]. . . . As is true of many business relationships, the fact that an individual is cloaked in a role of significant authority does not necessarily translate into tacit permission from the business owner for the individual to carve out a division of the business and take it with her when she changes employment. It is an employer's right to protect its interests in customer relationships that have been acquired through the efforts of the employee by way of a reasonably crafted covenant not to compete. . . .

Our finding that Ms. Giacomelli's testimony that she was not aware that the Non-Compete related to the Competition Team as well as her regular role at [Buckingham] was not credible is buttressed by the language of the Agreement. Paragraph 2 of the Non-Compete reads, ***verbatim***:

2. Studio shall provide the premises upon which the instructors or lessons are provided by the instructor to the students, at no charge to the instructor, with the exception of group and solo/private instructions/lessons for the competition team members/students.

A reasonable interpretation of this language clearly indicates that as a signatory to the Non-Compete, Ms. Giacomelli was on notice that the Competition Team was within the ambit of the Agreement.

. . . .

It was clear to this Court, and it should have been readily apparent to Ms. Giacomelli, that the exception to the "no charge" policy in paragraph two (2) of the Non-Compete relates to the Competition Team, which indicates that the Agreement is applicable to the Competition Team. We find this matter complained of within [Giacomelli's] appeal, then to be wholly without merit.

Rule 1925 opinion, 9/3/15 at 4-5 (citations omitted).

This court agrees with the trial court's reasoning. Further, although Giacomelli operated the competition team, Scott was a signer on the competition team bank account, the team had the name "Buckingham", and operated from Buckingham's location.

## E. Duration of Agreement.

Appellants next contend that, under the plain language of the Agreement, the Agreement would expire one year from the date it was signed. Giacomelli signed the Agreement on August 29, 2010. She opened for business with Libra on August 1, 2011 and held summer camps later in August 2011. Libra received $3,011.25 in fees for the summer camps. Giacomelli argues that that amount should be the limitation of her damages.

The trial court notes that Giacomelli failed to raise this issue before the trial court, and consequently, it is waived. A review of the record confirms the trial court's observation. An issue that is not raised in the trial court cannot be raised for the first time on appeal. Pa.R.A.P. 302(a); *See In re F.C. III*, 2 A.3d 1201, 1211-1212 (Pa. 2010).

The trial court also points out that even if not waived, this issue has no merit because the plain language in Paragraph 7 of the Agreement provides that the restrictions in terms of non-competition continue for a 9-month term of the Agreement and for one year thereafter. A review of the Agreement confirms the trial court's assessment.

### F. Mitchell.

Appellants next contend that the trial court erred when it allowed Mitchell to testify to a report that was handwritten over the lunch hour and offered in response to issues raised on cross-examination. Mitchell prepared a 2013 report concerning what appellants call a business appraisal of Buckingham. Then, on April 28, 2014, Mitchell issued a supplemental report which contained an analysis of the economic damage allegedly suffered by Scott as a result of Giacomelli's violation of the Agreement. When Mitchell testified initially, he did not calculate lost profits but lost revenue. After Mitchell heard testimony regarding the markup on costumes and dancewear, he attempted to make a new calculation regarding lost profits and was recalled to the stand. Mitchell reduced the amount of damages as a result of this new calculation. Appellants argue that they suffered prejudice as they were unable to conduct discovery and prepare rebuttal on the issue of lost profits when the trial court permitted Mitchell to amend his reports and attempt to calculate lost profits based upon Scott's testimony and unverified information.

The trial court essentially accepted Mitchell's testimony but then modified or reduced the amount of damages from the figure calculated by Mitchell.

Pa.R.C.P. No. 4003.5 provides in pertinent part:

> [T]he direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer in an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. No. 4003.5.

Courts have implemented the rule through an inquiry as to whether a discrepancy between the information contained in the expert report and the expert's testimony would prevent the other party from preparing a meaningful response or would mislead the other party. **See Chanthavong v. Tran**, 682 A.2d 334, 340 (Pa.Super. 1996).

Here, Mitchell revised his assessment based on testimony provided by both Scott and Giacomelli. Mitchell revised his assessment to the benefit of Giacomelli. It is difficult to see how Giacomelli either was prevented from responding to Mitchell's testimony or was misled in some way by it. This court finds no error here.

## G. **Damages**.

Appellants next contend that Scott failed to meet her burden to prove damages because the proper measure of damages was lost profits and not what revenue Scott would have received if Giacomelli had remained employed at Buckingham. Appellants argue that Mitchell's reports and testimony are based on "nothing more than . . . speculation." (Appellants' brief at 31.) Appellants also argue that Mitchell was not given a separate revenue breakdown for the Competition Team and therefore could not account for which fees were generated by the Team, which was important because those fees went to Giacomelli. Mitchell further did not account for normal attrition and assumed that all of the students who left Buckingham would return to Buckingham if they did not go to Libra. Further, some students may have decided to leave Buckingham because Giacomelli was no longer there. Appellants also assert that Scott's testimony concerning the markup on dancewear and other clothing items was unclear at best.

While the measure of damages was to some extent speculative, damages arising from the violation of a covenant not to compete can be difficult to calculate accurately. *Worldwide Auditing Services v. Richter*, 587 A.2d 772, 777-778 (Pa.Super. 1991). The accurate measure of damages would be the amount of profits lost because of the violation of the restrictive covenant. Mitchell and the trial court attempted to determine this amount through the revenue lost due to the number of students that left

Buckingham for Libra. The trial court made its determination based on the testimony of Scott, Mitchell, and Giacomelli as well as its credibility determinations of that testimony. This court finds no error.

## H. **Libra.**

Finally, appellants contend that the judgment is improper as to Libra because Libra was not a party to the Agreement and the customer list which Giacomelli/Libra obtained was the list of the members of the Competition Team for which Giacomelli maintained the records. Appellants also assert that the members of the team could be easily ascertained by anybody observing the competition.

The trial court addressed this issue:

> To suggest, as have Appellants, that [Libra] was not party to the Agreement and that therefore judgment should not have been entered against [Libra] would simply allow Ms. Giacomelli to evade the duty imposed upon her in the restrictive covenant, which reads in relevant part, at paragraph 7b, as follows:
>
> . . . Instructor shall not . . . engage in the business of the teaching or instruction in any form of dance or exercise, whether as an instructor, **as a sole proprietor, partner, shareholder, officer, director**, employee, agent or other representative **of any entity which engages in such business**. (emphasis added [by trial court]).
>
> It is disingenuous to suggest that [Libra] was not a party to the Agreement and that therefore judgment as to [Libra] was entered in error. The record is abundantly clear that Ms. Giacomelli established [Libra] in May of 2011, that [Libra] is the owner and operator of her dance studio, and that Ms. Giacomelli is the sole member and Chief Operating Officer of

[Libra]. . . . Ms. Giacomelli used the address of her personal residence when she executed the Operating Agreement for [Libra]. . . . Ms. Giacomelli's personal e-mail address is libradancecompany@yahoo.com. The above facts are portions of the substantial evidence presented at trial indicating that [Libra] is the legal entity associated with the dance studio business operated by Ms. Giacomelli in violation of the restrictive covenant.

It is clear, then, that this matter complained of on appeal is without merit.

Rule 1925 opinion, 9/3/15 at 7-8 (citations omitted).

This court agrees with the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/27/2016